United States District Court
Eastern District of Michigan
Northern Division

United States of America,                    No. 23-cr-20676

                        Plaintiff,           Honorable Thomas L. Ludington

    vs.

D-5 Anthony Thelen,

                        Defendant.

_____/

## Government's Sentencing Memorandum

At its core this case is simple — lying to get money. But the role Anthony Thelen played in it—going back to the early days of SSI—is one of the reasons it became complicated and uncommon. The intricacies of the conspiracy increased over the years that Thelen was with SSI, and he played a role in efforts to protect and hide illegal income streams as were devised and executed. However, Thelen is the least culpable of the five defendants. The reasons for this will be discussed below, but they are significant and worthy of serious consideration as the Court decides what Thelen's sentence should be.

## I.    <u>Background</u>

Thelen pleaded guilty to conspiracy to defraud the United States, in violation of 18 U.S.C. § 371 (Count 2). As the Court previously recognized, the charges arise from fraudulent conduct "in three parts," including "fraudulently misrepresent[ing] SSI's overhead and labor costs to artificially inflate MDOT's reimbursement." ECF No. 150, PageID.1623. Thelen and his co-defendants overbilled MDOT through "two separate schemes flush with fraudulent misrepresentations and omissions." *Id.*, PageID.1630.

It is unnecessary to repeat the Court's full recitation of the factual allegations and evidence against Thelen, *see generally* ECF No. 150, PageID.1623–39, but the Court got it right. The government adopts the timeline of relevant case events, the description of the charge to which Thelen has pleaded guilty, and the statement of the offense conduct detailed by the probation department in the Presentence Investigation Report (PSR) dated October 8, 2025. Here, the government focuses on the particular events and facts that are relevant to the sentence this Court should impose on Thelen.

## II.   <u>Thelen's Participation in the Fraud</u>

In August 2001, B. Bartlett, J. Bartlett, and G.S. opened SSI. Publicly filed documents including stock purchase agreements, disadvantaged business enterprise (DBE) applications and "no change" affidavits, and MDOT prequalification packages all reported—falsely— that G.S., a minority, was a 51% owner of SSI. B. Bartlett, J. Bartlett, and G.S. were equal owners of SSI and related entities from 2001 until G.S.'s death in 2011.

In 2002, Thelen joined SSI and—by at least 2004—he was sharing equally in the profits of SSI and 2SI. There continues to be considerable discussion and disagreement between the parties about whether Thelen was an owner of SSI during the conspiracy. The government maintains that he was, both by contractual agreements between the five co-defendants and by how the business of SSI was managed. Thelen maintains that the publicly facing documents controlled legal ownership. But at least as far back as 2009, Thelen was referred to as an owner of SSI by the accounting firm that performed year-end equalization reports for SSI. And as the 2009 report reflects, Thelen, J.

3

Bartlett, B. Bartlett and G.S. were treated as equal owners when it came to the money—profits were shared equally. (Exhibit A).

Thelen, B. Bartlett, and J. Bartlett continued as equal owners with various co-defendants throughout SSI's corporate life until July 2019. One reason for this artifice was to support SSI's claimed identity as a disadvantaged business. Another reason the for the facade was to facilitate fraudulent billing practices and to inflate reimbursement rates charged to MDOT.

Thelen pleaded guilty to engaging in a fraudulent conspiracy beginning in February 2011, but parts of this scheme began earlier. While Thelen denies that he knew the relationship between 2SI, 3SI, and SSI was being used to illegally inflate the overhead rate calculated by SSI, and the evidence establishes that he knew the true relationship between SSI and its related entities was being hidden.

For example, Thelen was copied on the March 2, 2011, memorandum prepared for G.S.'s widow after G.S.'s sudden and unexpected death in February 2011. (Exhibit B). Because publicly filed corporate documents falsely reported that G.S. was a 51% owner of SSI, the surviving owners needed to set the record straight for his widow to

protect their actual ownership interests. This memorandum makes it clear that Thelen and the other SSI defendant-owners were[1]—in reality—equal partners and that public records indicating that G.S. was a 51% owner "were so written as to qualify the business as a 'minority owned business' with the State of Michigan Department of Transportation." *Id.*

The government accepts that even though Thelen knew his wife was being paid for work she did not do, he did not know those costs were being used to calculate SSI's overhead rate until 2017. But in May 2017, Thelen did find out that his wife's salary and bonuses, as well as

---

[1] Thelen and his co-defendants have argued they were not equal owners of SSI, 2SI, 3SI, GEO, and Southfield IT (SFIT), because publicly filed documents reported that J. Bartlett and Semenchuk owned SSI, B. Bartlett and Thelen owned 2SI and 3SI, and Adam Ball and his wife owned SFIT. But all five defendants shared equally in the profits of SSI, 2SI, 3SI, GEO, and SFIT. These entities shared resources, including an office manager and bookkeeper. Management decisions for all the entities were made by all five defendants and money routinely moved between the entities at their direction. In secret agreements the defendant-owners referred to each other as equal owners regardless of what publicly filed documents reported. And most importantly, the defendants conducted the business of SSI, 2SI, 3SI, GEO, and SFIT as one entity. Because of their conduct, the government refers to them as owners or defendant-owners.

those of other owner-spouses were included in overhead, and he did nothing to stop it or report it.

By the time G.S. died, J. Bartlett had for some time been negotiating with Andrew Semenchuk to join SSI as another owner. Shortly after G.S.'s death, Semenchuk left his job at MDOT and joined SSI. With his addition and that of Adam Ball, the defendant-owners needed to clarify their relationship to each other and the various SSI entities. On February 25, 2011, Thelen and the other defendant-owners executed a new secret agreement in which they acknowledged they were equal owners of SSI and each of its related entities, regardless of what any publicly facing corporate documents stated. (Exhibit C).

On March 14, 2011, B. Bartlett sent an email to the defendant-owners containing two versions of SSI's ownership and its related companies. The first version divided ownership of 2SI, 3SI, and SSI in a way that fraudulently supported higher reimbursement claims to MDOT and supported SSI's DBE efforts. The second—and accurate version—confirmed the defendant-owners' intent that they owned the entities equally. The truthful version controlled how they managed SSI and what compensation Thelen and his co-defendants received.

6

On April 19, 2011, B. Bartlett sent an email to Thelen and the other defendant-owners, urging them to get on the same page so they could "keep all of our lies straight so we don't look like idiots." And B. Bartlett wasn't the only defendant-owner trying to manage the lies they were telling. On November 11, 2011, J. Bartlett sent an email to Thelen and the other defendant-owners of SSI and bragged that "I am still planning on calculating the overhead rate so that we get where we want it. Then we can have them review and 'rubber stamp' it…so to speak."

By the end of June 2012, the defendant-owners were finalizing the details of their plan to hold Semenchuk out as the 51% owner of SSI. This prompted Ball to circulate a new version of the secret agreement for the defendant-owners to execute. Again, they agreed that they were all equal 20% owners of all SSI related entities, regardless of what SSI documents said publicly. (Exhibit D).

By November 2013, Semenchuk was frustrated with how long MDOT was taking to process SSI's application for DBE status and he circulated a draft letter to Thelen and the other defendant-owners seeking concurrence in its tone and substance, which he received. (Exhibit E). The letter is lengthy, aggressive, and full of false and

misleading statements. Semenchuk ends the letter with "SSI's viability and existence does not rely in any other firm but itself. I can replace all my vendors tomorrow including 2si] and 3 and continue to function independently." *Id.* On December 19, 2013, MDOT denied SSI's application for DBE status. On July 25, 2015, based on the false and fraudulent statements made by Semenchuk and approved by Thelen and the other defendant-owners, USDOT overruled MDOT and granted SSI DBE status.[2]

By August 28, 2014, when SSI was deep into its effort to qualify as a DBE, J. Bartlett, sent an email to the defendant-owners bragging, "Not bad for a bunch of white guys trying to be a minority-owned business… And we will be billing the FUCK out of August thru November for sure." And this was not just conceit. By September 2014, the defendant-owners were putting this billing promise into action. On

---

[2] SSI appealed MDOT's denial of SSI's DBE application in a letter dated January 21, 2014. This letter was signed and submitted by Semenchuk after being fully vetted by all five defendant-owners. The appeal letter was full of false statements, many about the role Thelen played at SSI and the relationship between SSI, 2SI, and 3SI. But when given the opportunity to weigh in on its contents, Thelen called it "very complete and well written." (Exhibit F). Thelen was not the moving force in the DBE efforts, and he never submitted false statements to MDOT. But it would be an overstatement to say he never supported the efforts.

September 25, 2014, J. Barlett sent an email to Thelen and the other defendant-owners suggesting how they could inflate billings for September, October, and November. (Exhibit G). The conversation included giving the wives "…bigger raises to help with overhead…" And "coming up with additional scanner charges." Another idea was to raise the defendant-owners' reported hours. *Id.*

By the end of December 2014, Ball and Semenchuk had completed their buy-in obligations and were able to share fully in SSI's profits. On December 31, 2014, Semenchuk proposed forming an IT company "for overhead purposes." Thelen responded: "Sounds legit." (Exhibit H). Beginning in 2015, SSI started fraudulently billing MDOT for IT costs that it did not incur. MDOT calculates that it overpaid SSI $1,928,372 based on these false billings.

As time went on, Thelen and his co-defendants successfully and fraudulently obtained DBE status for SSI, continued to bill MDOT for payroll and IT services SSI did not incur, and inflated reimbursement from MDOT by hiding the true relationship between 2SI, 3SI, and SSI. At the end of every year, a thorough report was generated which equalized all the profits, losses, and obligations of SSI and all its

entities, and split the net profits equally between the defendant-owners. And every year SSI filed a prequalification package with MDOT containing false information to calculate an inflated overhead rate for reimbursement.

From the beginning of Thelen's connection to SSI, the true ownership of SSI was concealed from MDOT, and Thelen knew this. From the beginning, Thelen knew his wife was being paid for work she wasn't doing, but Thelen insists that he did not know his wife's wages were included in SSI's overhead rate. Thelen also claims that he never thought he was an owner of SSI and thought Semenchuk owned 51% of the company. In whatever way an "owner" is defined, the evidence is clear that—in the one way that really matters—the five defendants shared equally in the profits of SSI and all its related entities. And the business of SSI and its related entities was managed by all five defendant-owners as one entity.

The factual basis supporting Thelen's guilty plea relies heavily on a legally-valid and appropriate "willful blindness" theory of culpability. The evidence is replete with examples of obviously fraudulent conduct and every defendant is included in virtually every email conversation

about that conduct. In other words, Thelen was willfully blind to a great deal. The government and Thelen do not agree on every aspect affecting Thelen's sentence, but there are stark differences in his culpability and that of his co-defendants, not the least of which is his behavior since July 2019.

**Thelen's Cooperation**

From the beginning of the FBI investigation into SSI, Thelen has remained willing to cooperate. Thelen's admissions about his own involvement have remained the same, even if his efforts to convince the government that he was always forthcoming fell short. The simple fact that Thelen met with the government on numerous occasions to answer questions and explain how SSI worked. This unquestioningly aided the investigation. And the information Thelen provided about his co-defendants was corroborated.

It is also significant that from the beginning of the investigation, Thelen agreed to testify at trial. He also agreed that FBI reports of his proffer sessions could be turned over to the other defendants as soon as they were produced and approved—even as he continued to work with some of them at SSI. Whether Thelen's willingness to testify at trial

had any impact on his co-defendants' decisions to plead guilty cannot be

known with any certainty. But what is clear is that Thelen's testimony

would have given the jury valuable insight into the relationship

between the defendants and the company that only an insider could.

The government and SSI have entered into a Non-Prosecution

Agreement (NPA). Thelen is an owner of SSI and by the terms of the

agreement will be putting his ownership shares into an irrevocable

trust. This is meant to further distance SSI from control by Thelen, J.

Bartlett, and B. Bartlett. The terms of the NPA are robust and include

a strict compliance plan. Negotiations leading to the execution of the

NPA were lengthy and difficult. The government is not privy to

communications and efforts that took place at SSI during the

negotiations. However, the government understands that Thelen was

instrumental in facilitating acceptance of the agreement.

The government is confident that Thelen's counsel will provide the

Court with the details of Thelen's efforts during the NPA negotiations.

The NPA was negotiated and executed with the goal to save SSI from

being indicted and going out of business. And its terms will help to

ensure that SSI will be run with integrity in the future. Thelen's efforts

to facilitate the execution of the NPA should be taken into consideration by the Court in deciding his sentence.

When considering the appropriate sentence for Thelen it is the government's position that he played an important role but is not as culpable as any of the other defendants. Accordingly, the government recommends that the court impose a sentence of one year and one day.

## III.   Sentencing Guideline Calculations

### A.   Base Level - 6:  USSG 2B1.1(a)(1)

Thelen pleaded guilty to one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371. The maximum possible penalty is 5 years imprisonment. This guideline provision sets the base level at 6. (PSR ¶ 42).

### B.   Loss:  USSG 2B1.1(b)(1)(J): +16

The PSR correctly applies a 16-level upward adjustment, pursuant to § 2B1.1(b)(1)(I), because the fraud loss exceeds $1.5 million. (PSR ¶ 43).

In determining the amount of loss, the district court is to determine it by a preponderance of the evidence. *United States v. Triana*, 468 F.3d 308, 321 (6th Cir. 2006). The court is not required to

compute the loss with precision, and it need only make a reasonable estimate of the loss given the available information. *Id*. at 320; USSG § 2B1.1, comment. n.3(B).

The parties agree that if the Court accepts the plea agreement, "the guideline range will be predicated on a fraud loss of more than $550,000 and less than $3,500,000." ECF No. 278, PageID.3129.

The government and Thelen do not agree on the fraud loss Thelen is responsible for, but the difference is not that wide. It straddles two guideline loss ranges. The government calculates the fraud loss as more than $1.5 million but less than $3.5 million as follows:

- In May 2017, Thelen was put on notice that the wives' salaries and bonuses were included in the overhead rate (OH) calculation. At that time, SSI was being paid using an OH rate calculated on 2016 costs. Thelen did nothing to investigate it or put a stop to it. And he enjoyed disbursements throughout the year and a December equalization payout based, in part, on payments MDOT made to SSI using a fraudulent OH rate. The amount of loss attributed to spouses in 2017 is $373,141.76. (ECF No. 305-3

PageID. 3561, Exhibit C to Government's Sentencing Memo for J. Bartlett).

- Likewise, in 2018, MDOT reimbursed SSI using an overhead rate SSI calculated using 2017 costs. Those costs included salaries and bonuses paid to the wives. Again, Thelen did nothing to investigate or correct this calculation and he enjoyed inflated disbursements throughout the year as well as a fraudulently inflated equalization payout in December. The amount of loss attributed to spouses in 2018 is $582,729.13. *Id*.

- In early 2019, Thelen was tasked with helping J. Bartlett determine what SSI's IT costs were for 2018. If SSI's IT costs were incurred because of a legitimate, arm's length relationship with a third-party company this calculation would have been easy. Invoices would have reflected work done and paid for. But this evidence did not exist. Thelen tried to find support for the costs SSI claimed the year before and found none. And he was told by Semenchuk that he would find none. Ultimately, Thelen cobbled together data usage and storage numbers, but warned J. Bartlett not to claim them. Thelen did not report the issue to MDOT and

15

continued to enjoy disbursements based on SSI's inflated reimbursement from MDOT. And had the search warrants not been executed in July 2019, Thelen would have expected to receive a fraudulently inflated equalization payment in December 2019.

The government calculates total loss for 2017 and 2018 payroll overpayments, and 2018 IT overpayments at $1,742,233.94.

### C.    <u>Restitution</u>

This court must order restitution, pursuant to 18 U.S.C. § 3663A, for monetary losses suffered by any individual or entity who was a victim of the fraud scheme. Thelen agreed to pay restitution in the amount of $914,360.00 to the victim, Michigan Department of Transportation, representing one-fifth of $4,571,800.00, which is the Government's calculation of total unpaid restitution." ECF No. 270, PageID.3064.

## IV.  <u>Application of 18 U.S.C. § 3553</u>

Section 3553(a) requires the court to impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing.  In order to determine the "particular" sentence to

impose, this Court must consider the familiar statutory factors listed in §3553(a)(1)–(7).

The probation department calculates Thelen's guidelines at 24-30 months. (PSR ¶ 87). If the Court accepts the plea agreement, Thelen's sentence would be capped at 18 months. ECF No. 278, PageID.3131. After consideration of all the sentencing factors set forth in 18 U.S.C. § 3553(a), the most appropriate sentence for Thelen is one year and one day.

A.   **The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

Thelen's offense was complex, highly orchestrated, and devastating to the trust that the State of Michigan, USDOT, and MDOT gives self-reporting companies to whom they award contracts. The conspiracy Thelen was part of was extensive, well-planned, and took place of many years. Just in 2012–2018, the conspiracy involved over-payments by MDOT to SSI of more than $12 million. The scheme demonstrated disrespect for the law and for the basic moral and ethical behavior expected. And it was well within his power to cease his criminal activity at any point. But the money was just too good.

17

## B.   <u>The History and Characteristics of the Defendant</u>

Given his background, family support, employment history, education, and extensive connections to the community, Thelen had every opportunity to succeed and thrive in the legitimate career he chose. Thelen did not resort to crime out of financial desperation. Instead, at the very least, Thelen purposely and intentionally turned a blind to a multi-pronged scheme that was both extensive and complex. But at its core, it was a quintessential example of "lying to get money" driven purely by greed.

The Court may hear Thelen offer the excuse that he worked hard and that SSI did the work better than anyone else. There was nothing more important to the success of the conspiracy and scheme than the fact that SSI did the work and did it well. It tricked MDOT into awarding contracts based on lies and likely contributed to MDOT giving SSI the benefit of the doubt once questions arose. It is the government's position that Thelen understood that SSI was taking advantage of MDOT's good opinion of them.

**C.**    **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, To Promote Respect for the Law, and to Provide Just Punishment for the Offense.**

A sentence of one year and one day would reflect the seriousness of the offense, promote respect for the law, and adequately punish Thelen for his criminal behavior. It would also account for his cooperation with the government. Thelen pleaded guilty to engaging in an eight-year conspiracy to defraud the United States that caused significant financial harm to MDOT, parts of the scheme began in 2001. Such repeated, serious criminal behavior calls for a prison sentence to punish him and promote respect for the law.  A sentence of one year and one day is adequate to achieve those objectives.

**D.**    **The Need to Afford Adequate Deterrence to Criminal Conduct and To Protect the Public From Further Crimes of the Defendant**

A sentence of one year and one day is necessary to deter others as well as to protect the public from further criminal activity of Thelen.

The justice system must send a clear message to those inclined to engage in widespread fraud—especially involving highway construction contracts—that such conduct will result in a prison sentence. A sentence of one year and one day will achieve this objective.

**E.    The Need to Provide the Defendant with Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner**

There is no need in this case to adjust the sentence below the guideline range in order to provide Thelen with "needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." § 3553(a)(2)(D).  The prison system can accommodate all of Thelen's medical conditions and it is unlikely that he needs to seek further educational opportunities.

**F.    The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who have been Found Guilty of Similar Conduct**

While the sentencing guidelines are advisory, they remain the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform Act of 1984.  Reference to the guidelines, coupled with careful consideration of the § 3553(a) factors relevant to a specific defendant, is the only available means of preventing the disfavored result of basing sentences on the luck-of-the-draw in judicial assignments. Accordingly, the Supreme Court has held that "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process" in order to assure fair, proportionate, and uniform sentencing of criminal offenders. *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007).

Here, the parties have agreed to cap Thelen's sentence at 18 months if the Court accepts the plea agreement. But taking into consideration Thelen's relative culpability compared to his co-defendants, a sentence of one year and one day, although lower than the guidelines calculated by the probation department, would not create an unjustified disparity.

## V.    <u>Conclusion</u>

Based on the extent of Thelen's conduct, the role he played in the conspiracy, and his cooperation, the government urges this Court to impose a sentence of one year and one day in prison.

Respectfully submitted,

JEROME F. GORGON JR.
United States Attorney


 s/ Karen L. Reynolds
Karen L. Reynolds
William J. Vailliencourt, Jr.
Assistant U.S. Attorneys
211 West Fort Street, Suite 2001
Detroit, MI  48226
(313) 226-9672
karen.reynolds@usdoj.gov
william.vailliencourt@usdoj.gov


Dated:  November 13, 2025

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 13, 2025, I electronically filed

the foregoing document with the Clerk of the Court using the ECF

system which will send notification of such filing to the attorneys of

record.

s/ Karen L. Reynolds
Karen L. Reynolds  (P31029)
Assistant U.S. Attorney
211 West Fort Street, Suite 2001
Detroit, MI  48226
(313) 226-9672
karen.reynolds@usdoj.gov
