United States District Court
Eastern District of Michigan
Northern Division

| | |
|---|---|
| United States of America, | No. 23-cr-20676 |
| Plaintiff, | Honorable Thomas L. Ludington |
| vs. | |
| D-3 Adam Ball, | |
| Defendant. | |

_____/

**<u>Government's Sentencing Memorandum</u>**

This case is about lying to get money. Adam Ball's role in the conspiracy is an example of how extraordinary the conspiracy and scheme to defraud became. Ball and his co-defendants relentlessly used uncommon means over many years to cheat the Michigan Department of Transportation out of a staggering amount of money. Ball came up with the best description of the conspiracy and scheme was coined by Ball about him and his co-defendant-owners.[1] It was a "five-headed monster." (ECF No. 198-2, PageID.2260, filed under seal).

---

[1] Ball and his co-defendants have argued they were not equal owners of SSI, 2SI, 3SI, and Southfield IT (SFIT), because publicly filed

## I. <u>Background</u>

Ball pleaded guilty to conspiracy to defraud the United States, in violation of 18 U.S.C. § 371 (Count 2). As the Court previously recognized, the charges arise from fraudulent conduct "in three parts," including "fraudulently misrepresent[ing] SSI's overhead and labor costs to artificially inflate MDOT's reimbursement." (ECF No. 150, PageID.1623). Ball and his co-defendant-owners overbilled MDOT through "two separate schemes flush with fraudulent misrepresentations and omissions." *Id.*, PageID.1630.

It is unnecessary to repeat the Court's full recitation of the factual allegations and evidence against Ball, *see generally* ECF No. 150,

---

documents reported that J. Bartlett and Semenchuk owned SSI, B. Bartlett and Thelen owned 2SI and 3SI, and Adam Ball (Ball) and his wife owned SFIT. But all five defendants shared equally in the profits of SSI, 2SI, 3SI, and SFIT. These entities shared resources, including an office manager and bookkeeper. Management decisions for all the entities were made by all five defendants and money routinely moved between the entities at their direction. In secret agreements the defendant-owners referred to each other as equal owners regardless of what publicly filed documents reported. And most importantly, the defendants conducted the business of SSI, 2SI, 3SI, GEO, and SFIT as one entity. Because of their conduct, the government refers to them as owners or defendant-owners.

PageID.1623–39, but the Court got it right. The government adopts the timeline of relevant case events, the description of the charge to which Ball has pleaded guilty, and the statement of the offense conduct detailed by the probation department in the Presentence Investigation Report (PSR) dated October 8, 2025. Here, the government focuses on the particular events and facts that are relevant to the sentence this Court should impose on Ball.

## II. Ball's Participation in the Fraud

By the time G.S., a founding owner of SSI, died Jeff Bartlett (J. Bartlett) had already been negotiating with Andrew Semenchuk to join SSI as an owner. Shortly after G.S.'s death Semenchuk left his job at MDOT and joined SSI as an owner, which coincided with Ball also joining SSI as an owner. Prior to leaving MDOT, Semenchuk had long email conversations with Ball voicing concerns about leaving his comfortable job at MDOT for a new opportunity at SSI. Ball responded at length assuring Semenchuk that he is making the right decision: "Don't get nervous, this is a great opportunity for both of us to be 20% partners in the whole conglomerate. Don't feel like an island." (Exhibit A).

With the addition of Semenchuk and Ball, the defendant-owners of SSI needed to clarify their relationship to each other and the various SSI entities. On February 25, 2011, Ball and the other four defendant-owners executed a secret agreement in which they acknowledged that they were all equal owners in SSI and its related entities, regardless of what publicly facing corporate documents stated. (Exhibit B).

In early March 2011, Semenchuk and Ball were finalizing the details of their roles in the ownership of SSI and its related entities. This included funding Semenchuk's company GEO by sending fake invoices to SSI so Semenchuk could get paid, deciding whose wives would be included in payroll, and making sure Semenchuk and Ball both had a "slush" credit card.[2] (Exhibit C).

On March 11, 2011, B. Bartlett sent an email to the defendant-owners containing two versions of SSI's ownership and its related companies. The first version divided ownership of 2SI, 3SI, and SSI in a way that fraudulently supported higher reimbursement claims to

---

[2] A "slush" credit card was an SSI company credit card each defendant-owner was issued. They were allowed to use the card for personal expenses that were charged to and paid by SSI. The use of these cards was considered at the end of the year for equalization purposes but was not declared as income by the defendant-owners.

MDOT and supported SSI's DBE efforts. The second—and accurate version—confirmed the defendant-owners' intent that they owned the entities equally. The truthful version controlled how they managed SSI and what compensation Ball and his co-defendants received.

By the end of June 2012, the defendant-owners finalized the details of their plan to hold Semenchuk out as the 51% owner of SSI. This prompted Ball to circulate a new version of the secret agreement for the defendant-owners to execute. Again, they agreed that they were all 20% owners of all SSI related entities, regardless of what SSI documents said publicly. (Exhibit D).

By November 2013, Semenchuk was frustrated with how long MDOT was taking to process SSI's application for DBE status and he began circulating a draft letter to Ball and the other defendant-owners seeking concurrence in its tone and substance, which he received. (Exhibit E). The letter is lengthy, aggressive, and full of false and misleading statements. Semenchuk ends the letter with "SSI's viability and existence does not rely in any other firm but itself. I can replace all my vendors tomorrow including [2si] and [3si] and continue to function independently." *Id.* On December 19, 2013, MDOT denied SSI's

5

application for DBE status. On July 25, 2015, based on the false and fraudulent statements made by Semenchuk—approved by Ball and the other defendant-owners—USDOT overruled MDOT and granted SSI DBE status.

USDOT's reversal coincides closely with the completion of Semenchuk and Ball's buy-in obligations for SSI ownership, allowing them to share fully in the equalization process at the end of every year. Notably, on December 31, 2014, Semenchuk sent the defendant-owners an email entitled "SSI IT Company," suggesting "forming an IT company for [overhead] reasons" and proposing that "all of [SSI's actual IT provider's] bills [could] go to this new company" such that the expenses could "be marked up before [being] sent to SSI." (Exhibit E). Ball responded "Sounds good to me. Creative." *Id*. The other defendant-owners agreed, and Southfield IT a/k/a/ NEC (SFIT) was created. Semenchuk directed an employee of SSI's actual IT provider to reissue invoices to SFIT and assured him they would be paid, as always, by SSI. And from then until July 2019, SFIT was used to overbill MDOT

6

by $1,928,373.12.[3]

By the end of 2015, SFIT joined the "SSI Group" in the equalization process. And if there was any doubt that SSI and its related entities were one company, it can be put to rest after reading the December 30, 2015, memorandum sent to SSI by SSI's accountant. (Exhibit F). The memorandum contains a list of actions SSI had to take before the end of the year to support equalization efforts. The list includes moving money between the entities and to the defendant-owners, issuing fraudulent loans, all to ensure that by the end of the year each of their "cash after tax" will be close to equal. *Id.*

As time went on, Ball and his co-defendants successfully and fraudulently obtained DBE status for SSI, continued to bill MDOT for payroll and IT services SSI did not incur, and inflated reimbursement from MDOT by hiding the true relationship between 2SI, 3SI, and SSI. At the end of every year, a thorough report was generated which equalized all the profits, losses, and obligations of SSI and all its

---

[3] At the end of 2018, Ball and Semenchuk stepped down as owners of SSI. Ball went back to being an employee and Semenchuk became a contractor. Because there was no longer a need to use SFIT to fund Ball's 20% ownership interest, by the Spring of 2019, SFIT became inactive.

7

entities and split the net profits equally between the defendant-owners. And every year SSI filed a prequalification package with MDOT containing false information to calculate an inflated overhead rate for reimbursement.

SFIT was not just a fiction the defendant-owners used to artificially increase SSI's overhead rate. The defendant-owners used it as a vehicle to funnel money to Ball as part of the year-end equalization process. From January 2016, through February 2019, 98% of funds deposited into SFIT's account came from SSI. During that same period 82% of the withdrawals from SFIT's account went to Ball and his wife. (Exhibit G).

After SFIT was created Ball and his co-defendant-owners successfully maintained the artifice that Semenchuk was SSI's 51% owner and that SFIT, 2SI, and 3SI were independent third-party vendors of SSI. But by mid-2018, Ball and Semenchuk were negotiating with the other defendant-owners to buy them out. A persistent theme posed by the defendant-owners of SSI is that Semenchuk was the actual and legal 51% owner of SSI. Circumstantial evidence, and the defendant's statements during the conspiracy belie this. But most

8

telling are their conversations and efforts in 2018 when Semenchuk and Ball were negotiating their buy-out. Extraordinary efforts were made to acknowledge their equal ownership and to negotiate buy-out terms consistent with that. There is no evidence that Semenchuk sought or was entitled to 51% of SSI assets. (Exhibit H).

**Ball's Post Search Warrant Statement**

There is no better evidence of Ball's role in the conspiracy and his intent than the statements be made to FBI agents on July 25, 2019, while search warrants were executed on SSI's headquarters. Ball began the interview by maintaining that he and his wife owned SFIT, that it was located at his home, and that it provided IT services to SSI. (ECF No. 198-2, PageID.2182-2185, filed under seal). This quickly fell apart when he acknowledged that even though neither he nor his wife had an IT background, they were the only employees of SFIT. Ball had no idea how much data storage SFIT had, or how the storage fees worked. *Id.* at 2186–96. Finally, Ball acknowledged that SFIT was merely a shell company. *Id.* at 2198.

Ball admitted that his wife signed timesheets, but did not work at SFIT. *Id.* at 2212. And that he was sick to his stomach about the fact

9

that SFIT was excessively overbilling for storage capacity it did not have. *Id.* at 2259. Asked if the five defendant-owners were working together, Ball responded: "It was a five-headed monster." *Id.* at 2260. To Ball's credit he ended the interview by admitting he had been ashamed for the whole five years and he regretted the day he got involved in management. *Id.* at 2268–69.

Ball and his co-defendants may claim to be as equal in their culpability as they were as partners in and owners of SSI. But Ball overstates his culpability. By Ball's own admissions, he was well aware of the details and extent of the conspiracy, he willingly joined it, and he shared equally in its illegally gained profits. But Ball did not take the lead in making false statements to MDOT. He didn't certify prequalification packages as J. Bartlett and Semenchuk did. He did not fill out and certify DBE applications and no change affidavits like Semenchuk did. And he did not testify falsely at an MDOT hearing regarding C.S.'s qualifications as a 51% owner of SSI. For these reasons it is the government's position that Ball should be sentenced to 18 months in custody.

10

### III. Sentencing Guideline Calculations

#### A. Base Level - 6: USSG 2B1.1(a)(1)

Ball pleaded guilty to one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371. The maximum possible penalty is 5 years imprisonment. This guideline provision sets the base level at 6. (PSR ¶ 47).

#### B. Loss: USSG 2B1.1(b)(1)(J): +16

The PSR correctly applies a 16-level upward adjustment, pursuant to § 2B1.1(b)(1)(I), because the fraud loss exceeds $1.5 million. (PSR ¶ 48).

In determining the amount of loss, the district court is to determine it by a preponderance of the evidence. *United States v. Triana*, 468 F.3d 308, 321 (6th Cir. 2006). The court is not required to compute the loss with precision, and it need only make a reasonable estimate of the loss given the available information. *Id.* at 320; USSG § 2B1.1, comment. (n.3(B)).

The parties agree that if the Court accepts the plea agreement, "the guideline range will be predicated on a fraud loss of more than $1,500,000 and less than $3,500,000." (ECF No. 277, PageID.3099).

11

## C. Restitution

This court must order restitution, pursuant to 18 U.S.C. § 3663A, for monetary losses suffered by any individual or entity who was a victim of the fraud scheme. Ball agreed to pay restitution in the amount of $914,360.00 to the victim, Michigan Department of Transportation, representing one-fifth of $4,571,800.00, which is the Government's calculation of total unpaid restitution." *Id.* at PageID.3102–03.

## III. Application of 18 U.S.C. § 3553

Section 3553(a) requires the court to impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing. In order to determine the "particular" sentence to impose, this Court must consider the familiar statutory factors listed in §3553(a)(1)–(7).

The probation department calculates Balls guidelines at 24-30 months. (PSR ¶ 84). If the Court accepts the plea agreement, Ball's sentence would be capped at 21 months. *Id.* at PageID.3101. After consideration of all the sentencing factors set forth in 18 U.S.C. § 3553(a), the most appropriate sentence for Ball is 18 months.

### A. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

Ball's offense was complex, highly orchestrated, and devastating to the trust that the State of Michigan, USDOT, and MDOT gives self-reporting companies to whom they award contracts. Ball engaged in an extensive, well-planned scheme to defraud over the course of 8 years that, just in 2012–2018, involved over-payments by MDOT to SSI of more than $12 million. His scheme demonstrated disrespect for the law and for the basic moral and ethical behavior expected. And it was well within his power to cease his criminal activity at any point. But the money was just too good.

### B. The History and Characteristics of the Defendant

Given his background, family support, employment history, education, and extensive connections to the community, Ball had every opportunity to succeed and thrive in the legitimate career he chose. Unlike many criminal defendants who resort to crime out of financial desperation, Ball and his co-defendant owners did not devise their scheme in the face of economic privation. Instead, Ball purposely and intentionally engaged in a multi-pronged scheme that was both extensive and complex. And he was driven purely by greed.

The Court will no doubt hear Ball and his co-defendants offer excuses, chief among those: "But we did the work and did it better than anyone else." There was nothing more important to the success of the conspiracy and scheme than the fact that SSI did the work and did it well. It tricked MDOT into awarding contracts based on lies and likely contributed to MDOT giving SSI the benefit of the doubt once questions arose.

Ball understood that SSI was taking advantage of MDOT's good opinion of them. But once he accepted the offer of owning 20% of the SSI conglomerate, he embraced every element of the conspiracy and was actively involved in coming up with new ways to increase illegally gained profits from MDOT as the years passed.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, To Promote Respect for the Law, and to Provide Just Punishment for the Offense.

A sentence of 18 months would reflect the seriousness of the offense, promote respect for the law, and adequately punish Ball for his criminal behavior. Ball pleaded guilty to engaging in an eight-year conspiracy to defraud the United States that caused significant financial harm to MDOT. Such repeated, serious criminal behavior calls

for a prison sentence to punish him and promote respect for the law. A sentence of 18 months is adequate to achieve those objectives.

### D. The Need to Afford Adequate Deterrence to Criminal Conduct and To Protect the Public From Further Crimes of the Defendant

A sentence of 18 months is necessary to deter others as well as to protect the public from further criminal activity by Ball.

The justice system must send a clear message to those inclined to engage in widespread fraud—especially involving highway construction contracts—that such conduct will result in a prison sentence. A sentence of 18 months will achieve this objective, especially in light of Ball's level of culpability when compared to his co-defendants. A sentence below 18 months will lessen the deterrent effect on others who might face the same temptation.

### E. The Need to Provide the Defendant with Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner

There is no need in this case to adjust the sentence below the guideline range to provide Ball with "needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." § 3553(a)(2)(D). The prison system can accommodate all of Semenchuk's medical conditions and it is unlikely that he needs to seek further educational opportunities.

15

F. <u>The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who have been Found Guilty of Similar Conduct</u>

While the sentencing guidelines are advisory, they remain the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform Act of 1984. Reference to the guidelines, coupled with careful consideration of the § 3553(a) factors relevant to a specific defendant, is the only available means of preventing the disfavored result of basing sentences on the luck-of-the-draw in judicial assignments. Accordingly, the Supreme Court has held that "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process" in order to assure fair, proportionate, and uniform sentencing of criminal offenders. *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007).

Here, the parties have agreed to cap Ball's sentence at 21 months if the Court accepts the plea agreement. Given Ball's relative culpability—when compared to Semenchuk and J. Bartlett—a slightly lower sentence is appropriate. The government recommends a sentence of 18 months.

## IV. Conclusion

Based on the extent of Ball's conduct and the role he played in the conspiracy, the government urges this Court to impose a sentence of 18 months in prison.

                                  Respectfully submitted,

                                  JEROME F. GORGON JR.
                                United States Attorney

                                s/ Karen L. Reynolds
                                Karen L. Reynolds
                                William J. Vailliencourt, Jr.
                                Assistant U.S. Attorneys
                                211 West Fort Street, Suite 2001
                                Detroit, MI  48226
                                (313) 226-9672
                                karen.reynolds@usdoj.gov
                                william.vailliencourt@usdoj.gov

Dated:  November 13, 2025

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 13, 2025, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to the attorneys of record.

                         s/ Karen L. Reynolds
                         Karen L. Reynolds (P31029)
                         Assistant U.S. Attorney
                         211 West Fort Street, Suite 2001
                         Detroit, MI 48226
                         (313) 226-9672
                         karen.reynolds@usdoj.gov

19